In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-01-00024-CV


______________________________




DUKE ENERGY FIELD SERVICES ASSETS, L.L.C., Appellant



V.



NATIONAL UNION FIRE INSURANCE COMPANY


 OF PITTSBURG, PA, Appellee




 


On Appeal from the 11th Judicial District Court


Harris County, Texas


Trial Court No. 2000-32668




 




Before Cornelius, C.J., Grant and Ross, JJ.


Opinion by Chief Justice Cornelius



O P I N I O N



 Duke Energy Field Services Assets, L.L.C., appeals from a summary judgment rendered in
favor of National Union Fire Insurance Company. Duke is the current owner of a gas plant in Port
Arthur. Zaval-Tex Construction Company contracted with a former owner of the gas plant to
provide workers for the plant. Zaval-Tex purchased a liability insurance policy from National
Union. Rafael Chavez, an employee of Zaval-Tex, sued Duke for personal injuries. Duke requested
that National Union defend it, and National Union refused. Duke sued National Union, seeking a
declaratory judgment that National Union was obligated to defend it in Chavez's suit. The question
is whether Duke was an "additional insured" under the insurance policy issued by National Union
to Zaval-Tex. The trial court granted National Union's motion for summary judgment. The trial
court based its summary judgment on its conclusion that Duke was not an additional insured within
the terms of Zaval-Tex's policy because there was no "written contract" between Duke and Zaval-Tex as required by National Union's policy. (1)

 Zaval-Tex's policy contains the following provision:

 It is agreed that Additional Insureds are covered under this policy as required by
written contract, but only with respect to liabilities arising out of the operations
performed by the Named Insured. 


(Emphasis in the original).


Both parties agree that this language means that if Zaval-Tex had a written contract to provide
construction work for another company, and if that company required Zaval-Tex to obtain insurance,
National Union's policy would provide that coverage. National Union takes the position that there
is no written contract between Zaval-Tex and Duke containing language that requires insurance
coverage, and therefore, National Union is not required to provide a defense for Duke in Chavez's
lawsuit.

 The summary judgment proof shows that Zaval-Tex had provided workers to do maintenance
and construction work at the gas plant, and had done so since the mid-1980's. In 1994, Zaval-Tex
entered into a written contract with the original owner of the gas plant, Centana Intrastate Pipeline
Company. That contract required Zaval-Tex to obtain insurance coverage to protect Centana.
National Union does not deny that this written contract sufficed to make Centana an additional
insured as provided by the policy. At that time, Centana was a corporate subsidiary of PanEnergy
Corporation. 

 At some point during the next two years, the Centana subsidiary ceased to operate the facility,
and another PanEnergy subsidiary, PanEnergy Field Services, Inc., began operating the plant. The
ownership of the plant completely changed in June 1997, when Duke purchased PanEnergy
Corporation. On that purchase, Duke changed the name of PanEnergy to Duke Energy Field
Services, Inc. (2) The contract between Zaval-Tex and Centana was never terminated or amended, and
Zaval-Tex continued providing the same services to the plant for the new owner. 

 According to James Rintamaki, the general manager of east gulf coast operations for Duke,
whose affidavit is attached to Duke's motion for summary judgment, the following sequence of
events occurred in connection with the ownership of the plant. Centana changed its name to ANGC
Corporation, which then changed its name to PanEnergy Services. In 1996 PanEnergy Services
assigned its ownership of the plant to PanEnergy Field Services, Inc. In June 1997, Duke acquired
PanEnergy Corporation, including ANGC. Rintamaki also stated that Centana was and still remains
a part of the PanEnergy family of companies-which is now part of Duke. 

 Rintamaki also stated that Zaval-Tex had secured and sent to PanEnergy a "Certificate of
Liability Insurance" showing PanEnergy as an additional insured, and that Duke relied on that
certificate as proof that Zaval-Tex had complied with its contractual requirement to name PanEnergy
as an additional insured. A copy of that document is attached to the summary judgment motion. It
was produced by the insurance agency, lists National Union as the company affording coverage, and
specifies that PanEnergy Field Services, Inc. is an additional insured on the policy. 

 In its motion for summary judgment, Duke generally argued that as the purchaser of the
property, it stood in the position of its predecessors and that nothing reflected that any party had
repudiated any portion of the contract. Duke also contends that because Zaval-Tex was a party to
the contract, and because Duke evidenced its acceptance of that contract by acting under it and
continuing to employ Zaval-Tex, Duke became a party to the contract. Under that theory, the
contract would continue as a written contract between Duke and Zaval-Tex.

 When one business entity is acquired in its entirety by another, in the absence of specific
terms to the contrary, both the liabilities and assets of the acquired company are transferred to the
purchaser. (3) The stipulations reflect that Duke did not simply purchase the plant from PanEnergy,
but purchased PanEnergy itself. A successor corporation is typically invested with the rights and
assumes the burdens of the predecessor corporation. See Procter v. Foxmeyer Drug Co., 884 S.W.2d
853 (Tex. App.-Dallas 1994, no writ); Volvo Petroleum, Inc. v. Getty Oil Co., 717 S.W.2d 134 (Tex.
App.-Houston [14th Dist.] 1986, no writ); Reuben H. Donnelley Corp. v. McKinnon, 688 S.W.2d
612 (Tex. App.-Corpus Christi 1985, writ ref'd n.r.e.). Similarly, when a subsidiary enters into a
contract and that subsidiary is then merged into a parent corporation, the contracts of the subsidiary
are treated as contracts with the parent. See TXO Prod. Co. v. M. D. Mark, Inc., 999 S.W.2d 137
(Tex. App.-Houston [14th Dist.] 1999, pet. denied).

 In order to be entitled to summary judgment in this case, National Union was required to
establish that there was no genuine issue of material fact and that it was entitled to judgment as a
matter of law. Tex. R. Civ. P. 166a(c); City of Houston v. Clear Creek Basin Auth., 589 S.W.2d 671
(Tex. 1979); Baubles & Beads v. Louis Vuitton, S.A., 766 S.W.2d 377 (Tex. App.-Texarkana 1989,
no writ). The question on appeal is whether the summary judgment proof conclusively establishes
that the movant is entitled to summary judgment. Gonzalez v. Mission Am. Ins. Co., 795 S.W.2d
734, 736 (Tex. 1990). Because the movant bears the burden of showing the absence of an issue of
fact, all conflicts in the summary judgment evidence are disregarded, evidence favorable to the
nonmovant is taken as true, and all doubts as to the existence of a genuine issue of material fact are
resolved in favor of the nonmovant. Nixon v. Mr. Prop. Mgmt. Co., 690 S.W.2d 546 (Tex. 1985). 
 There are three legal theories which, if supported by the facts, would make Duke a party to
the contract with Zaval-Tex: (1) through purchases, mergers, and/or name changes, Duke succeeded
to the rights and liabilities of Centana. See Thompson v. N. Texas Nat'l Bank, 37 S.W.2d 735 (Tex.
Comm'n App. 1931) (opinion approved); Procter v. Foxmeyer Drug Co., 884 S.W.2d at 861;
Enchanted Estates Cmty. Ass'n v. Timberlake Improvement Dist., 832 S.W.2d 800, 802 (Tex.
App.-Houston [1st Dist.] 1992, no writ); (2) Duke and Zaval-Tex by their actions agreed to adopt
the written contract between Centana and Zaval-Tex as their contract and acted pursuant to it. See 
Simmons & Simmons Constr. Co. v. W. L. Rea, 155 Tex. 353, 286 S.W.2d 415, 419 (1955); Decker
v. Commercial Credit Equip. Corp., 540 S.W.2d 846 (Tex. Civ. App.-Texarkana 1976, no writ);
Pierce v. Pickett, 432 S.W.2d 586, 589 (Tex. Civ. App.-Amarillo 1968, no writ); Stout v. Oliveira,
153 S.W.2d 590, 596 (Tex. Civ. App.-El Paso 1941, writ ref'd w.o.m.); and (3) Centana and/or its
successors orally assigned their rights in the contract to Duke. See West Realty & Inv. Co. v. Hite,
283 S.W. 481, 483 (Tex. Comm'n App. 1926) (opinion approved); Sorenson v. Dawdy, 196 S.W.2d
687, 689 (Tex. Civ. App.-Fort Worth 1946, no writ); Restatement (Second) Of Contracts §§
317, 324 (1981). As indicated by the review of the summary judgment proof, Duke produced
summary judgment evidence sufficient to raise a fact issue on each of these legal theories.

 In reviewing National Union's motion, we must determine whether, as a matter of law, it has
shown that it is not required to defend or indemnify Duke because it is not a party to a written
contract with Zaval-Tex. We find that this burden was not met. The evidence that Duke treated
Zaval-Tex as being employed under the terms of the written contract that Centana signed is
undisputed. It paid invoices referencing the contract, and the summary judgment evidence shows
that Duke's management considered the contract to be in full effect. National Union's argument that
Duke's later creation of another contract that Zaval-Tex signed shows otherwise is unpersuasive. 
National Union's position that both parties must sign in order for the written contract to have effect
is contrary to the law. 

 National Union also argues that there was never any meeting of the minds between Duke and
Zaval-Tex, that Duke's affidavits do not show that its management assented to the terms of the
contract, and that they only show that it intended to operate under terms like those in the Centana
contract. We disagree. The affidavits indicate that there was an intent to apply the terms of the
contract, that the relationship between the companies had been governed by those terms, and that the
parties believed the contract governed their relationship and acted accordingly. 

 National Union suggests that if Duke succeeded to the contract between Centana and Zaval-Tex, it was only an oral contract, not a written contract, so the terms of the insurance policy were not
met. We disagree. If Duke acquired the rights under the written contract, it was operating under the
written contract, not an oral one. 

 National Union also argues that even if the Centana contract is really a written contract
between Duke and Zaval-Tex, it only requires Zaval-Tex to obtain coverage as to Centana, the party
named in the body of the contract. Again, we disagree. If the contract is effective between Duke and
Zaval-Tex, Duke succeeds to all of Centana's rights and obligations under the written contract.

 National Union's final argument is that it is entitled to know, by looking at the contract, who
becomes an additional insured. If National Union's policy required that the additional insureds be
identified in the policy by name, or provided extra coverage for differing amounts depending on who
the additional insureds were, this argument might have merit, but the policy involved here requires
neither. It simply provides coverage to additional insureds when Zaval-Tex is, by written contract
with another party, required to obtain such coverage. There is no requirement that Zaval-Tex notify
National Union if such a contract exists, or the identity of the additional insured. 

 Duke also filed a motion for summary judgment, and it contends on appeal that the trial court
should have granted its motion. In general, an order granting summary judgment may be appealed,
but an order denying summary judgment may not. Novak v. Stevens, 596 S.W.2d 848, 849 (Tex.
1980). An exception to this rule exists when both parties file motions for summary judgment and
the court grants one and overrules the other. Tobin v. Garcia, 159 Tex. 58, 316 S.W.2d 396, 400
(1958). On appeal, the proper disposition is for the appellate court to render judgment for the party
whose motion should have been granted. Members Mut. Ins. Co. v. Hermann Hosp., 664 S.W.2d
325, 328 (Tex. 1984); McLemore v. Pac. Southwest Bank, FSB, 872 S.W.2d 286, 289 (Tex.
App.-Texarkana 1994, writ dism'd). Each party, however, must clearly prove its right to judgment
as a matter of law, and neither party may prevail simply because the other party failed to make the
required proof. Bd. of Adjustment of City of Dallas v. Patel, 887 S.W.2d 90, 92 (Tex.
App.-Texarkana 1994, writ denied); James v. Hitchcock Indep. Sch. Dist., 742 S.W.2d 701, 703
(Tex. App.-Houston [1st Dist.] 1987, writ denied). 

 We have found that fact issues were raised by the summary judgment evidence on the legal
theories supporting Duke's causes of actions. Summary judgment for Duke or National Union was
therefore improper.

 

 For the reasons stated, we reverse the summary judgment and remand the cause to the trial
court for trial.

 


 William J. Cornelius

 Chief Justice


Date Submitted: August 29, 2001

Date Decided: October 24, 2001


Publish


1. Both parties filed motions for summary judgment.
2. This information is provided in stipulations entered into by the parties and attached to the
motion for summary judgment.
3. A discussion of the concept of successor businesses and assignees is found in Thompson v.
N. Texas Nat'l Bank, 37 S.W.2d 735, 739 (Tex. Comm'n App. 1931) (opinion approved); Procter
v. Foxmeyer Drug Co., 884 S.W.2d 853, 861 (Tex. App.-Dallas 1994, no writ); Enchanted Estates
Cmty. Ass'n v. Timberlake Improvement Dist., 832 S.W.2d 800, 803 (Tex. App.-Houston [1st Dist.]
1992, no writ). 


        Allstate first contends it did not breach its contract with Hyman. Allstate argues that, because
it sent a letter requesting various authorizations and because Hyman did not provide those items,
Allstate conclusively proved Hyman never triggered Allstate's obligation to pay, and thus the failure
to pay is not a breach of contract. 
            In the letter on which Allstate relies, Allstate told Hyman what was needed "to conclude your
claim, if liability is accepted for your loss." The letter states that it enclosed a "Power of Attorney
to Transfer Motor Vehicle" form and that it was necessary to return the form to enable Allstate to
issue payment and keys. The letter also demands that Hyman return either a clear title, or contact
information about any lienholder, and that she contact the lienholder to authorize release of the
payoff information to the insurer's representative. The letter finally directs her to call any location
where the vehicle is stored with directions to release the vehicle to Allstate. It then contains
incomplete telephone numbers at which Hyman could contact some unidentified person for more
information. 
            The letter does not support Allstate's position. It contains nothing that relates to the issue
before the court and jury: Allstate's investigation of the claim and its decision to accept or not accept
her claim. All of the items demanded (several of which were actually already in Allstate's files) have
to do, as clearly stated in the letter, with the procedure that would ultimately be followed after
Allstate accepted liability for the loss. Thus, Hyman's failure to provide a release of information and
authority over the vehicle—to which Allstate had not yet become entitled—is not conclusive
evidence of a breach by Hyman. 
            In addition, Hyman testified it was her understanding that, if she signed the requested power
of attorney, she would be agreeing to the amount Allstate wanted to pay and that she would have no
recourse after signing it. Her belief is understandable, because had she provided the authority
requested, she would have turned over to Allstate her rights to the vehicle, without payment or an
agreement on the value of the vehicle.
            Thus, neither Allstate's position that the proof that Hyman had breached first was conclusive,
nor its statement in its brief that it was entitled to judgment notwithstanding the verdict, are viable. 
There is evidence to support the jury's finding, and the evidence to the contrary is not conclusive.
            This also disposes of Allstate's second, related, contention based on the same argument and
letter: that the jury's finding that Hyman did not breach the contract was made against the
overwhelming weight of the evidence.
            Allstate also complains, based on these same factors, that Hyman breached her agreement
to cooperate with Allstate in the investigation and settlement of any claim—noting in its brief
Hyman specifically agreed to authorize Allstate to obtain any pertinent record. The language of the
policy requires Hyman to cooperate in the investigation, settlement, or defense of any claim or suit,
to promptly send copies of any notices or legal papers received in connection with the accident or
loss, and to authorize Allstate to obtain other pertinent records. 
            The items sought, however, are not pertinent to Allstate's investigation of the accident. They
are only, as stated above, pertinent to settlement as far as they would inform Allstate where to send
the money after a settlement was reached and as far as power to actually take possession of the
vehicle. These items could properly apply only after the settlement was reached. To allow the
company to set the value of the property and simultaneously to demand the immediate authority to
dispose of it before it has agreed to the valuation—on penalty of holding the insured in breach of
contract—is not contemplated by the contract.
2.         Subrogation Rights Impaired?
            Allstate also argues Hyman impaired its right of subrogation against Baker by settling with
her before the trial between Hyman and Allstate. In a brief argument, Allstate points out that Hyman
released her claims against Baker for all claims and causes of action, and argues that this constituted
a breach because it "eliminated any claim available to Allstate for any amount it may pay for physical
damage to Hyman's vehicle."
            The portion of the insurance contract on which Allstate relies is entitled "Right to Recover
Payment." It provides that:
A.If we make a payment under this policy and the person to or for whom
payment was made has a right to recover damages from another we shall be
subrogated to that right. That person shall do:
1.Whatever is necessary to enable us to exercise our rights; and
2.Nothing after loss to prejudice them. . . . 
 
B.If we make a payment under this policy and the person to or for whom
payment is made recovers damages from another, that person shall:
1.Hold in trust for us the proceeds of the recovery; and
2.Reimburse us to the extent of our payment. . . . 

As pointed out by Hyman, the clause begins, "If we make a payment." Allstate has made no
payment. However, the policy requires that the insured do nothing after loss to prejudice Allstate. 
It is equally clear that the section contemplates that, when an insured, who ultimately recovers from
Allstate, is also entitled to recover damages from another entity, Allstate is entitled to recover its
subrogation rights. 
            Despite Allstate's vigorous argument to the contrary, that subrogation right is not such as
would void the contract. Allstate directs us to Sentry Ins. v. Siurek, 748 S.W.2d 104 (Tex.
App.—Houston [1st Dist.] 1987, no writ), as support for its position. That case contains language
broadly stating that, where a person settles with or releases a wrongdoer from liability for the loss
before payment of the loss has been made by the insurance company, the latter's right of subrogation
is thereby destroyed—and that such an insured, who has barred a subrogation claim by his or her
own company, cannot maintain a suit against his or her own insurance company for the same
damages. Id. at 106 (citing Hollen v. State Farm Mut. Auto. Ins. Co., 551 S.W.2d 46, 49 (Tex.
1977)).


 Siurek bases its holding on the one recovery rule. The insured is entitled to but one
recovery under the terms of the contract. Siurek, 748 S.W.2d at 106 (citing Bradshaw v. Baylor
Univ., 126 Tex. 99, 104, 84 S.W.2d 703, 705 (1935)).
            Hollen does not support the broad holding given to it in Siurek. In Hollen, the Texas
Supreme Court recognized, in a complicated fact situation involving a number of parties and a
severance, that a judgment in favor of one of several defendants was final, and thus the insurer's right
of subrogation against that defendant was destroyed. It did not hold that the right of subrogation was
in the nature of a covenant, that actions tending to impair that right would completely void the
underlying contract, or that the insurer could not seek to be made whole through other means. 
Further, there is some difference in analysis found in the cases depending on whether the subrogation
is based on contract (legal subrogation) or on general principles of law (conventional subrogation).
            In either instance, applying a concept described as the "made-whole doctrine," an insured's
entire loss must be satisfied before the insurer will be entitled to recover under its right of
subrogation. Therefore, the insurer may not ordinarily recover under subrogation until the amount
recovered by the insured from the insurer, combined with the amount recovered by the insured from
the tortfeasor, exceeds the insured's loss. Ortiz v. Great S. Fire & Cas. Ins. Co., 597 S.W.2d 342,
343 (Tex. 1980). 
            The appropriate amount to be recovered under subrogation, however, is a determination that
is based in the rules of equity. The underlying concepts that control such a review were discussed
in some detail by the Austin Court of Appeals.
The distinction we drew between legal and conventional subrogation in Lexington
[Insurance Co. v. Gray, 775 S.W.2d 679 (Tex. App.—Austin 1989, writ denied),
disapproved on other grounds, Amberboy v. Societe de Banque Privee, 831 S.W.2d
793, 797 (Tex. 1992)] simply means that under conventional subrogation no
balancing of equities is necessary to determine whether the subrogee has a right to
recover at all. While an insurance contract providing expressly for subrogation may
remove from the realm of equity the question of whether the insurer has a right to
subrogation, it cannot answer the question of when the insurer is actually entitled to
subrogation or how much it should receive. . . . Contracts that give insurers the right
to subrogation "confirm, but [do] not expand, the equitable subrogation rights of
insurers." Oss [v. United Servs. Auto. Ass'n, 807 F.2d 457, 460 (5th Cir. 1987) ]. .
. . . To avoid injustice, the equities must still be balanced in deciding what amount,
if any, the subrogee is entitled to receive in a given case.

Esparza v. Scott & White Health Plan, 909 S.W.2d 548, 551–52 (Tex. App.—Austin 1995, writ
denied) (citations omitted); see Fortis Benefits v. Cantu, 170 S.W.3d 755, 758 (Tex. App.—Waco
2005, no pet. h.).
            Thus, if the insured has disregarded the insurer's subrogation rights, such as by agreeing to
a settlement with the tortfeasor that does not completely compensate the insured for the loss, the trial
court has discretion to balance the equities of the parties and grant the insurer some recovery. See
e.g., Esparza, 909 S.W.2d at 552–53) (trial court properly awarded health insurer half of medical
expenses it had paid on insureds' behalf out of insureds' settlement of medical malpractice claim
even though insureds were not fully compensated for their loss).
            Applying these concepts, we first conclude a subrogation clause in a contract does not act as
a covenant that would void the entirety of the contract. We next conclude that, where the
subrogation amount is definable, the insurer may be able to offset the judgment against it in favor
of its insured by the amount that is appropriate under the facts. In this case, that determination is
straightforward. The damages were all physical damage to the vehicle, and the jury determined the
value of the vehicle. Thus, the subrogation amount to which Allstate is entitled was determined at
trial.
            The trial court attempted to apply this concept by offsetting the actual damage award by the
amount of Hyman's recovery from Baker. The only real question remaining in that respect is whether
the court used the correct figure in calculating the offset. 
            We conclude that it did not. The injured party settled with the tortfeasor for an amount less
than the amount the jury ultimately determined was the actual value of Hyman's vehicle. Allstate
was contractually entitled to pursue subrogation for the amount determined to be the actual value of
the vehicle. Applying equitable principles to the award and the facts, and noting the lack of any clear
notification to Allstate of the settlement so that it could attempt to protect its rights, we conclude
Allstate is entitled to an offset against the damage award in the amount of the value of the vehicle,
less the deductible, as determined by the jury. Allstate would only be authorized to recover for its
subrogation rights no more than it was liable to pay the insured for the loss ($18,000.00 less $500.00
deductible = $17,500.00). This procedure is explicitly allowed by the insurance contract, which
states, "If we make a payment under this policy and the person to or for whom payment is made
recovers damages from another, that person shall: (1) Hold in trust for us the proceeds of the
recovery; and (2) Reimburse us to the extent of our payment."
            The judgment, as reformed, will reimburse Allstate to the extent of its payment and will
avoid any double recovery, as was the concern in Siurek.
            In a multifarious one paragraph argument, Allstate contends the trial court erred by overruling
Allstate's motion for summary judgment made on this ground. A party may not appeal from the
denial of a motion for summary judgment. Allstate also argues the court should have granted its
motion for judgment notwithstanding the verdict based on this claim. It is impossible to glean from
the brief, but we speculate that this argument is due to Allstate's position that it proved Hyman
breached first as a matter of law. As stated above, we disagree.
            Allstate also argues in two sentences, with no citation to the record, or to authority, or any
argument, that the trial court committed reversible error by refusing to allow Allstate to bring this
"critical, highly relevant evidence to the jury's attention." The briefing is inadequate to frame the
issue, to permit any reasoned response from Hyman, or to allow this Court to consider it. See Tex.
R. App. P. 38.1.
3.         The Actual Valuation of the Ford Explorer
            Allstate also contends the trial court erred in denying its motion for new trial on the issue of
damages because the evidence is factually insufficient to support the jury's award for the value of
the vehicle. Allstate specifically argues there is factually insufficient evidence to prove that the
difference in the value of the vehicle immediately before and after the accident was $18,000.00.
            Hyman testified that the pre-accident value of her vehicle was $18,000.00, and its
post-accident value was $1,250.00. Allstate argues that this sets the maximum possible value for
the vehicle at $16,750.00, and thus the evidence does not support the higher award. Allstate ignores
the existence of evidence, however, in the form of estimates of preaccident value presented to the
jury, ranging up to $22,000.00, and post-accident value ranging from $1,250.00 to $5,015.00. In
determining damages, the jury has discretion to award damages within the range of evidence
presented at trial. Gulf States Utils. Co. v. Low, 79 S.W.3d 561, 566 (Tex. 2002). The amount
awarded by the jury was within the range of evidence presented, and that evidence was clear and
straightforward. It is factually sufficient to support the verdict.
4.         Violation of Article 21.21 of the Texas Insurance Code
            Allstate next argues the evidence is not legally and factually sufficient to support the jury's
finding that Allstate violated Article 21.21 of the Texas Insurance Code. The jury found that Allstate 
violated the Code either by (a) misrepresenting a material fact or policy provision relating to the
coverage, or (b) failing in good faith to effectuate a prompt, fair, and equitable settlement of a claim
when the insurer's liability had become reasonably clear. 
            Specifically, Allstate argues that the case was formulated on allegations of post-loss
misrepresentations and then argues that post-loss misrepresentations must be more than a mere
breach of contract, relied on by the insured, and cause an injury independent of the denial of policy
benefits, citing Provident Am. Ins. Co. v. Castaneda, 988 S.W.2d 189, 198–200 (Tex. 1998). The
court in Castaneda reviewed the insurer's failure to respond to its insured's requests for explanation
for its refusals to pay, in the context of determining whether there was evidence of some additional
form of compensable damage to the insured's credit rating. The court concluded in analyzing the
action under Article 21.21-2, Section 2(b), the evidence showed that the only injury was because of
the denial of benefits and the evidence did not support any additional injury independent of the
policy. The court thus concluded the insurer was not separately liable for that failure because no
damage was caused independent of the denial of the claim. 
            The jury question in this case sought recovery of the amount due under the policy, not for
some extraneous additional recovery, and the language in the jury charge was taken from a different
section of the Code, Act of May 10, 2001, 77th Leg., R.S., ch. 290, § 1, 2001 Tex. Gen. Laws 548,
550 (repealed 2003) (formerly Tex. Ins. Code Ann. art. 21.21, § 4(10)(a)), which made behavior
actionable, in relevant part, as follows:
(10) Unfair Settlement Practices. (a) Engaging in any of the following unfair
settlement practices with respect to a claim by an insured or beneficiary:
(i) misrepresenting to a claimant a material fact or policy provision
relating to coverage at issue;
(ii) failing to attempt in good faith to effectuate a prompt, fair, and
equitable settlement of a claim with respect to which the insurer's liability has
become reasonably clear; . . . .

Act of May 10, 2001. Allstate takes the position there was no evidence of any actionable post-loss
misrepresentation made to Hyman, or on which she relied, or that produced any damage. However,
there was evidence Allstate told Hyman it had to protect a lienholder in settling the claim—when
it was not necessarily so. Allstate could have paid Hyman the amount, less a reasonable salvage
value, without involving the lienholder. 
            There was also evidence Allstate informed Hyman it had surveyed the value of similar
vehicles in the market to determine the value of Hyman's vehicle, when Allstate had not done so. 
The use of a national service, and of valuation reports from the Dallas-Fort Worth metroplex, does
not necessarily reflect the value of the vehicle in Lamar County, Texas. Hyman presented evidence
of comparables in Lamar County to support her valuation. This is evidence supporting the verdict,
and it appears to be both legally and factually sufficient.
            Allstate next contends there was no evidence it failed to attempt, in good faith, to effectuate
a fair, prompt, and equitable settlement of the claim. It is clear Allstate promptly acknowledged
coverage and offered a settlement. Allstate then argues that the evidence conclusively shows this
was a fair settlement offer—essentially because its appraisers testified that the amount was for the
value of the property ($14,425.00). As already discussed, Hyman presented evidence of local
appraisals ranging as high as $22,000.00. The jury ultimately found the true value of the vehicle in
the local market area to be $18,000.00. A $3,500.00 differential in a claim of less than $20,000.00
is a substantial difference. The jury had the right to determine that Allstate's offer was not fair, and
that the techniques used by Allstate to attempt to obtain an agreement from Hyman to this amount
were evidence Allstate did not act in good faith. 
            Further, Allstate stated in its demand it had used comparable vehicles to determine value,
when it had not—having used no vehicles from the immediate market—in the face of evidence that
such comparables were available. 
            The jury had the authority to consider all of this evidence and conclude Allstate did not
attempt in good faith to effectuate a prompt, fair, and equitable settlement—secure in the knowledge
that most individuals would bow to the demands so that they could use the money from their now
useless vehicle to obtain another. The jury could, thus, have perceived this situation as one where
the insured, instead, continued to demand the true value of her vehicle, rather than simply
acquiescing to Allstate. The finding has support in the evidence.
            Under the evidentiary standards set out above, there was both some, and factually sufficient,
evidence to support the jury's findings that Allstate made post-loss misrepresentations and that those
misrepresentations caused Hyman to suffer the loss of the benefit of her contracted-for bargain.


 
            Allstate further contends Hyman provided no or insufficient evidence that an Article 21.21
violation was a producing cause of damage to Hyman. Allstate suggests that, because the damages
are only claimed due to an alleged delay in payment of policy benefits, and because the chattel was
wholly destroyed, then no additional recovery is possible. 
            Article 21.21, Section 16(a) authorizes recovery for "actual damages," plus court costs and
reasonable and necessary attorney's fees, and if knowingly done, actual damages may be trebled. As
set out above, the jury could have concluded that the violation was an example of behavior of a
company attempting to maximize its profits by making an offer that might be marginally
acceptable—reasoning that most insureds would take what was offered with only minimal complaint
because they either needed replacement transportation immediately or because it would likely cost
more to contest the offer than could be obtained by doing so successfully. 
            In analyzing the claim, we are mindful the Legislature has directed that Article 21.21 "shall
be liberally construed and applied to promote its underlying purposes as set forth in this section." 
Act of Mar. 19, 1985, 69th Leg., R.S., ch. 22, § 1, 1985 Tex. Gen. Laws 395 (repealed 2003)
(formerly Tex. Ins. Code Ann. art. 21.21, § 1(b)). The statute was enacted to protect insurance
consumers by prohibiting unfair or deceptive practices in the business of insurance. Act of May 30,
1993, 73rd Leg., R.S., ch. 685, § 20.17, 1993 Tex. Gen. Laws 2559, 2704 (repealed 2003) (formerly
Tex. Ins. Code Ann. art. 21.21, § 1(a)); Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co., 77 S.W.3d
253, 260 (Tex. 2002); see State Farm Life Ins. Co. v. Beaston, 907 S.W.2d 430, 435 (Tex. 1995).
            The statute does not restrict "actual damages" to extra-contractual damages, but Allstate
argues that, because the damages were measured by the policy, no such damages exist. We
recognize that a number of courts, including this Court, have stated that the mere breach of an
insurance contract does not give rise to liability under the Insurance Code or the Deceptive Trade
Practices Act (DTPA).


 As applied, courts thus conclude that a post-loss denial of liability for a
questionable claim is not actionable under the DTPA or the Insurance Code.


 
            This is not a questionable claim. This case does not involve a denial of liability or a claim
of a mere breach of contract. Allstate admitted liability, but disputed the proper amount of payment,
and refused to tender any payment—even for the undisputed portion. Allstate further insisted it
could make no payment at all until and unless Hyman gave it full authority over the vehicle. 
Compare Colonial Co. Mut. Ins. Co. v. Valdez, 30 S.W.3d 514 (Tex. App.—Corpus Christi 2000,
no writ), holding that, even at the stage of an insured sending final proof of a theft loss, he did not
need to include copies of vehicle service records, a copy of the bill of sale or license registration
receipt, a negotiable title or copy of the title or all sets of keys—thus, the insured's failure to provide
those items did not excuse the insurer's unfair settlement practice by failing to timely pay the claim.
            There was also evidence Allstate did not seek to determine the value of the vehicle in the
"place where the damage was occasioned" (as required by Pasadena State Bank v. Isaac, 149 Tex.
47, 228 S.W.2d 127, 128 (1950), but instead in other areas around North Texas—despite evidence
of suggestions by Hyman and her attorney that Allstate should change the scope of its appraisal
comparables to the local area. The jury was entitled to determine that this evidence constituted a
failure to reasonably investigate and that failure would also support the verdict. 
            The jury's finding that the misrepresentations were knowing has sufficient evidentiary support
and removes Allstate's actions from the realm of an inadvertent mistake or shortcoming. Thus, the
cases cited by Allstate are distinguishable and do not control the jury's findings or its award based
on Allstate's misbehavior.
5.         Rental Value Damages
            Allstate next argues, focusing on the jury's award for reasonable rental value of a replacement
vehicle for a reasonable period of time at $3,600.00, that the amount of the damage award is
"improper and excessive." (The jury also found that the conduct was engaged in knowingly and that
additional damages of $54,000.00 should be awarded as punishment to the wrongdoer.) Allstate
argues the only damages that could properly be awarded were for the cost of obtaining alternative
forms of transportation during the three years Hyman's claim was in limbo and that Hyman presented
no evidence to support the $3,600.00 award. 
            There is, however, evidence in Allstate's defendant's exhibit three, that reflects Allstate was
approving a rental rate of $20.00 per day, and that by August 17, 2000, the rental had totalled
$600.00. Hyman also testified it cost about $40.00 per day for a rental, while the insurance covered
only up to $20.00 per day. 
            The jury was asked to determine the reasonable rental value of a replacement vehicle for a
reasonable period of time. 
            Generally, the correct measure for loss of use damages is the reasonable rental value of the
property or a substitute. Luna v. N. Star Dodge Sales, Inc., 667 S.W.2d 115, 119 (Tex. 1984),
overruled in part on other grounds by St. Elizabeth Hosp. v. Garrard, 730 S.W.2d 649 (Tex. 1987). 
However, it is not a prerequisite to recovery of damages that the plaintiff actually rent a substitute
during the period of the loss of use. Id. at 118. The primary purpose for allowing loss of use
damages is not simply to compensate the plaintiff for the expenses of a substitute, but to award the
owner actual pecuniary compensation for his or her loss. Latitude is allowed in determining
damages where there is no precise measurement. Int'l Great N. R.R. Co. v. Casey, 46 S.W.2d 669,
670 (Tex. Comm'n App. 1932, holding approved); Chem. Express Carriers, Inc. v. French, 759
S.W.2d 683, 687 (Tex. App.—Corpus Christi 1988, writ denied); see Mondragon v. Austin, 954
S.W.2d 191, 195 (Tex. App.—Austin 1997, pet. denied).
            The question does not specifically require the jury to find that Hyman spent that amount for
a rental vehicle, nor (in light of the other possible ways she might have obtained alternative
transportation) could it properly do so. It is merely a way to measure damages. The jury answered
the question asked, and the jury had some evidence before it from which it could determine a
reasonable amount. At forty dollars a day, the jury provided three months' rental. There is some
evidence to support the verdict, and the evidence is sufficient to allow that determination.
6.         Statutory Cap of Damages
            Allstate also contends the court erred in the calculation of the total damages. In this
argument, Allstate takes the position that the statute caps the total recovery at three times the actual
damages—not actual damages plus three times actual damages. Allstate directs this Court to no
Insurance Code cases directly on point, and we have discovered none. Its argument is based on the
analysis of similar language found in the DTPA, and the application of that language by the courts. 
See Tex. Bus. & Com. Code Ann. § 17.50(b)(1) (Vernon Supp. 2005).
            The Texas Insurance Code provides that a prevailing plaintiff may recover the amount of
actual damages, and if the trier of fact finds that the defendant's conduct was committed knowingly,
the "trier of fact may award not more than three times the amount of actual damages." Act of
May 19, 1995, 74th Leg., R.S., ch. 414, § 13, 1995 Tex. Gen. Laws 2988, 3000 (repealed 2003)
(formerly Tex. Ins. Code Ann. art. 21.21, § 16(b)(1)).


 During recodification, this section was
repealed. Its content was not substantively changed, and is now found at Tex. Ins. Code Ann.
§ 541.152 (Vernon 2005).
(b) In a suit filed under this section, any plaintiff who prevails may obtain:
(1) the amount of actual damages plus court costs and reasonable and
necessary attorneys' fees. If the trier of fact finds that the defendant knowingly
committed the acts complained of, the trier of fact may award not more than three
times the amount of actual damages; . . . .

Act of May 19, 1995.

            The DTPA provides that a prevailing consumer may recover economic damages. It allows
a consumer to recover up to three times the amount of economic damages if the trier of fact finds the
defendant acted knowingly, or three times the sum of the economic damages and mental anguish if
the trier of fact finds the defendant acted intentionally. Tex. Bus. & Com. Code Ann. § 17.50(b)(1);
Valley Nissan, Inc. v. Davila, 133 S.W.3d 702, 711 n.4 (Tex. App.—Corpus Christi 2003, no pet.). 
(b) In a suit filed under this section, each consumer who prevails may obtain:
(1) the amount of economic damages found by the trier of fact. If the trier of
fact finds that the conduct of the defendant was committed knowingly, the consumer
may also recover damages for mental anguish, as found by the trier of fact, and the
trier of fact may award not more than three times the amount of economic
damages; . . . . 
            This Court and others have concluded that the Legislature intended the treble damage
provision to be a cap on the total damages recoverable in a DTPA action. See Houston Livestock
Show & Rodeo, Inc. v. Hamrick, 125 S.W.3d 555, 584 (Tex. App.—Austin 2003, no pet.); Busse v.
Pac. Cattle Feeding Fund, 896 S.W.2d 807 (Tex. App.—Texarkana 1995, writ denied); see
generally Jim Walter Homes, Inc. v. Valencia, 690 S.W.2d 239, 241 (Tex. 1985);


 cf. Henry Schein,
Inc. v. Stromboe, 102 S.W.3d 675, 695 (Tex. 2002) (describing statute as requiring that a defendant
be found to have acted knowingly or intentionally for additional damages to be awarded, citing
DTPA statute limiting such damages to three times economic damages if defendant acted knowingly,
and three times mental anguish and economic damages if defendant acted intentionally). This at
least suggests that the "additional damages" are limited to three times economic damages and that
they are truly additional to the actual damages, rather than subsuming them.
            The section can be read to allow both actual damages and then an additional punitive award
of no more than three times the actual damage award. However, in light of the historical background
of the section, and because very similar language in the current version of the DTPA is interpreted
in this fashion, it is our conclusion that the section limits a plaintiff's recovery to three times actual
damages (plus court costs and reasonable and necessary attorney's fees). 
            Allstate also raises some additional arguments under this version of the contention of error. 
It also complains the court did not properly take into account the $500.00 deductible or the
$14,146.46 Hyman received from the person who collided with her vehicle. 
            We agree Allstate was entitled to these offsets. This is accomplished by authorizing Allstate
an offset of $17,500.00 from the $18,000.00 figure, which the jury established as the value of the
vehicle. 
            Allstate further contends that, because the award was under the contract, all offsets should
have been allowed before determining the maximum additional damages that could be allowed under
statute, relying on Smith v. Baldwin, 611 S.W.2d 611, 617 (Tex. 1980) (interim interest not allowed
as part of underlying total damages). As previously discussed, the award for additional damages in
this case was in tort, not contract. Further, the statute does not provide formal trebling of the verdict. 
Instead, on a finding that the acts complained of were knowingly committed, the statute provides a
ceiling of three times actual damages. 
            Recently, the Texas Supreme Court discussed settlement credits in Crown Life Ins. Co. v.
Casteel:
Under the one satisfaction rule, the nonsettling defendant may only claim a credit
based on the damages for which all tortfeasors are jointly liable. . . . the nonsettling
defendant is entitled to offset any liability for joint and several damages by the
amount of common damages paid by the settling defendant, but not for any amount
of separate or punitive damages paid by the settling defendant. 

22 S.W.3d 378, 391–92 (Tex. 2000) (citations omitted); CTTI Priesmeyer, Inc. v. K & O Ltd. P'ship,
164 S.W.3d 675, 684 (Tex. App.—Austin 2005, no pet.); Tex. Capital Sec., Inc. v. Sandefer, 108
S.W.3d 923, 926 (Tex. App.—Texarkana 2003, pet. denied). 
            Thus, under the one satisfaction rule, the nonsettling defendant may only claim a credit based
on the damages for which all tortfeasors are jointly liable. Casteel, 22 S.W.3d at 391; Mobil Oil
Corp. v. Ellender, 968 S.W.2d 917, 927–28 (Tex. 1998); Sandefer, 108 S.W.3d at 926. 
            If, as Allstate asks, we apply the offset before calculating the cap on the punitive award, there
would effectively be no punitive award. To so reward a defendant that a jury has determined was
a wrongdoer is improper. 
            Clearly, Allstate is entitled to an offset, and we have previously concluded that the amount
of the offset is not the amount of the settlement, but the amount for which it could have sought
subrogation: $17,500.00. The additional, punitive damages are a different category from actual
damages, and are imposed for a different purpose. Compare Casteel, 22 S.W.3d at 392, holding that
a nonsettling defendant cannot receive credit for settlement amounts representing punitive damages. 
Similarly, under these facts, we conclude that the subrogation offset is applied, not before calculating
the cap on punitive damages, but after. 
            The jury found the value of the vehicle was $18,000.00. The policy deductible was $500.00,
leaving Hyman's recovery for the vehicle at $17,500.00. Additionally, she was entitled to recover
$3,600.00 for the vehicle rental, resulting in total actual damages of $21,100.00. The maximum
award that is available is three times the total of actual damages, or $63,300.00 ($17,500 + $3,600.00
= $21,100.00 x 3).
            The jury awarded $54,000.00 as "additional damages." The cap on all damages awarded
(exclusive of costs and attorney's fees) is exceeded when the actual damages and the "additional"
damages are combined. That is impermissible under the terms of the statute. We thus reform the
judgment to provide an award of $63,300.00 for damages, in accord with the statutory cap. That
amount is reduced by the $17,500.00 of the subrogation offset, providing a net recovery of
$45,800.00, plus costs and attorney's fees.
7.         Attorney's Fees
            Allstate next argues that the court erred by awarding attorney's fees and costs because there
was no proof of a breach of contract or a violation of Article 21.21. Based on the foregoing
determinations, the contention of error is overruled.
HYMAN'S APPEAL
            Hyman contends in her own appeal from the judgment that the trial court should also have
awarded damages under Article 21.55 of the Texas Insurance Code, which specifies the time periods
during which the insurer must seek information and ultimately pay—and also sets out the recovery
available, plus a statutory award of eighteen percent per annum on the amount of the claim if the
insured prevails. The parties agree that Hyman could potentially have recovered under both statutes. 
They disagree on almost everything else. 
            Hyman begins her argument from her position that the trial court did grant her a directed
verdict on that claim, but then erred by failing to award damages under the article. There is no
formal ruling on the motion, and it is not referenced by the judgment. Allstate takes the position that
the trial court ruled in its favor by the letter in which it informed counsel how to prepare the
judgment. 
            Addressing that argument first, a letter is neither a judgment nor an order. A letter to counsel
may constitute the pronouncement of judgment if it is in sufficient detail to state the court's decision
on all the matters at issue and is filed with the clerk. Comet Aluminum Co. v. Dibrell, 450 S.W.2d
56 (Tex. 1970); Abarca v. Roadstar Corp. of Am., 647 S.W.2d 327 (Tex. App.—Corpus Christi
1982, no writ). A letter is not a rendition of judgment if it only indicates the court's intention to
render judgment in a certain way and sets out guidelines by which counsel are to draw a judgment. 
Mixon v. Moye, 860 S.W.2d 209, 210 (Tex. App.—Texarkana 1993, no writ); Ex parte Gnesoulis,
525 S.W.2d 205 (Tex. Civ. App.—Houston [14th Dist.] 1975, orig. proceeding). 
            Further, the letter says nothing about the court's disposition of the Article 21.55
claim—except by not referring to it. Under most circumstances, the letter itself would not constitute
a formal ruling on the motion for directed verdict. So far as an actual ruling exists, it is necessarily
the final judgment—which awards nothing under the Article 21.55 claim. Based on the judgment,
we conclude that the motion was denied.


 
            Hyman's total argument is quite brief and complains exclusively that the trial court should
have awarded damages as found by the jury, for an additional eighteen percent interest per annum
on the damage figure of $18,000.00 from August 2, 2000, until the day before judgment.
            Allstate argues that, as a matter of law, it proved it complied with its obligations under
Article 21.55, Section 2, and, thus, the court correctly denied Hyman's motion for directed verdict.
Preserved for Review?
            A number of courts, including this one, have explicitly held that the overruling of a motion
for directed verdict may be reviewed on appeal only if it was recited in a formal order or in the
judgment. Thedford v. Missouri Pac. R.R. Co., 929 S.W.2d 39, 50 (Tex. App.—Corpus Christi
1996, writ denied); Wal-Mart Stores, Inc. v. Berry, 833 S.W.2d 587, 590 (Tex. App.—Texarkana
1992, writ denied); W. Co. of N. Am. v. S. Pac. Transp. Co., 819 S.W.2d 952, 956 (Tex.
App.—Austin 1991, no writ); Soto v. S. Life & Health Ins. Co., 776 S.W.2d 752, 754 (Tex.
App.—Corpus Christi 1989, no writ); Superior Trucks, Inc. v. Allen, 664 S.W.2d 136, 145 (Tex.
App.—Houston [1st Dist.] 1983, writ ref'd n.r.e.). Compare Fletcher v. Minn. Mining & Mfg. Co.,
57 S.W.3d 602, 604 (Tex. App.—Houston [1st Dist.] 2001, no pet.) (court declined to imply ruling
on motion for directed verdict from trial court's ruling on jury charge requests).
            We conclude, based on the cases cited, that the contention has not been preserved for our
review.
            As reformed, the judgment is affirmed.



                                                                        Jack Carter
                                                                        Justice
 
Date Submitted:          February 23, 2006
Date Decided:             March 21, 2006